UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| DEVIN L. MEYER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Cause No. 1:08-cv-1423-WTL-DML |
| | ) |
| MICHAEL J. ASTRUE, Commissioner of | ) |
| the Social Security Administration, | ) |
| | ) |
| Defendant. | ) |

## ENTRY ON JUDICIAL REVIEW

Plaintiff Devin L. Meyer requests judicial review of the final decision of Defendant, Michael J. Astrue, Commissioner of the Social Security Administration ("the Commissioner"), determining that he is no longer entitled to receive Supplemental Security Income benefits ("SSI"). The Court rules as follows.

*Procedural Background and Applicable Standard*

Meyer received SSI benefits as a child due to attention deficit disorder/attention deficit hyperactivity disorder and cardiomyopathy. Pursuant to the Social Security Act ("the Act"), once he turned 18 his eligibility for benefits had to be reviewed under the rules for determining disability in adults. *See* 42 U.S.C. 1382c, § 1614(a)(3)(H)(iii). After an initial determination that he was no longer disabled as of February 2004, Meyer requested and received a hearing before an Administrative Law Judge ("ALJ"), who reached the same conclusion. After the Appeals Council denied his request for review, Meyer filed this action.

The Act, specifically 42 U.S.C. § 405(g), provides for judicial review of the Commissioner's denial of benefits. When the Appeals Council denies review of the ALJ's findings, those findings become the findings of the Commissioner. *See, e.g.*, *Henderson v. Apfel*,

179 F.3d 507, 512 (7th Cir. 1999). This Court will sustain the ALJ's findings if they are supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1999). In reviewing the ALJ's findings, the Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the ALJ. *See id.* While a scintilla of evidence is insufficient to support the ALJ's findings, the only evidence required is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

The ALJ "need not evaluate in writing every piece of testimony and evidence submitted." *Carlson v. Shalala,* 999 F.2d 180, 181 (7th Cir. 1993). However, the "ALJ's decision must be based upon consideration of all the relevant evidence." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). Further, "[a]n ALJ may not discuss only that evidence that favors his ultimate conclusion, but must articulate, at some minimum level, his analysis of the evidence to allow the [Court] to trace the path of his reasoning." *Diaz*, 55 F.3d at 307. In other words, the ALJ must clearly articulate his analysis of the evidence, building an accurate and logical bridge from the evidence to his conclusion. *See Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002); *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). An ALJ's articulation of his analysis "aids [the Court] in [its] review of whether the ALJ's decision was supported by substantial evidence." *Scott v. Heckler*, 768 F.2d 172, 179 (7th Cir. 1985).

### *Discussion*

Applying the four-step analysis applicable to determination of continuing disability upon reaching the age of 18, the ALJ determined that Meyer has the severe impairments of lymphedema, cardiomyopathy, depression, and anxiety, but that he nonetheless retained the

residual functional capacity to perform sedentary work in an environment free from extremes of temperature or humidity and relatively free from noxious fumes, gases, and respiratory irritants, and with the additional limitation that he be required to perform no more than simple, repetitive work that requires no more than superficial interaction with supervisors, co-workers, and the general public. Purportedly[1] based upon the testimony of a vocational expert, the ALJ determined that there were a significant number of jobs in the national economy that Meyer could perform despite his limitations; accordingly, the ALJ found that Meyer was not disabled as of February 23, 2004.

       The ALJ found that Meyer suffers from lymphedema, and there is ample evidence in the record that he suffers from pain, itching and burning in his legs as a result of that condition. In fact, as discussed more fully below, the record contains the opinion of four treating physicians that Meyer is disabled due to the symptoms caused by lymphedema. With regard to subjective symptoms such as pain, where, as here a claimant has a medically determinable impairment that is reasonably expected to produce the symptoms alleged, the ALJ must evaluate the credibility of the claimant's testimony regarding the extent of those symptoms. The regulations further provide that "we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements." 20 C.F.R. § 404.1529(c)(2).

---

[1] The Court notes that the ALJ mischaracterized the vocational expert's testimony in his decision. The ALJ gave the vocational expert two hypotheticals; in response to the one that corresponds with the residual functional capacity found by the ALJ, she opined that there were 2400 office clerk jobs available. Her testimony regarding the assembler and packer jobs referenced in the ALJ's decision was in response to a hypothetical that did not include any environmental restrictions. *See* Record at 105-06.

Therefore, the resolution of this case hinges on whether the symptoms Meyer experiences are as severe as he alleges–in which case he is clearly disabled–or of some lesser degree of severity. The ALJ found that Meyer's testimony regarding his symptoms was "not entirely credible."[2] Because the ALJ evaluates credibility by questioning and observing a live witness, not simply a cold record, an ALJ's credibility determination is reviewed deferentially and should be overturned only if it is "patently wrong." *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008). However, "[t]he determination of credibility must contain specific reasons for the credibility finding" and "must be supported by the evidence and must be specific enough to enable the claimant and a reviewing body to understand the reasoning." *Id.* (citing *Arnold v. Barnhart*, 473 F.3d 816, 822 (7th Cir. 2007)).

In this case, the ALJ's explanation for his credibility finding consists of an analysis of the record that is lengthy but, upon closer examination, inaccurate in a multitude of ways. The ALJ noted:

> Indeed, as shown above, the claimant's subjective complaints due to lymphedema were consistently not shown on repeat clinical exams. The claimant did report that his symptoms usually persisted from January through May, and this seems consistent with the record. Even so, clinical exams for the most part show persistent reddening and, on occasion, some edema, but none of the severe ulcerations or extreme skin pigment changes that the claimant alleged at the

---

[2] The ALJ's actual statement was as follows: "For all of the foregoing reasons, I conclude that the claimant's allegation of debilitating disabling symptoms, substantial functional limitations, and severely restricted activities of daily living as a result of his combined impairments are not supported by substantial evidence in the record. Accordingly, I find the claimant's testimony on the issue of total disability to be not entirely credible." Record at 34. The Court notes that, if taken at face value, this statement suggests a misunderstanding of the applicable standard. Because the record clearly establishes that Meyer has lymphedema and that lymphedema is reasonably expected to produce the pain and other symptoms described by Meyer, if his testimony regarding the extent of those symptoms is credible, his testimony would itself constitute the requisite evidence of disability; there does not have to be other evidence in the record that corroborates his testimony on that issue.

hearing.

Record at 33. As an initial matter, the Court notes that because subjective complaints are just that–subjective–they are never going to be "shown" on clinical exams; that is what distinguishes them from objective symptoms and requires the ALJ to make a determination regarding the claimant's credibility. Further, while the ALJ points to numerous medical records that he finds are inconsistent with Meyer's testimony regarding his lymphedema symptoms, in large part they simply are not.

For example, the ALJ finds it inconsistent that Meyer and his mother testified that his lymphedema "had persisted since very early in childhood (at about age three or four, according to his mother)" when a medical record from 2003 states that he "developed a lower extremity rash in early 2000." Record at 28. However, Meyer's mother actually testified that when he was three or four he experienced "burning, itching, [and] hurting" in his feet that a podiatrist diagnosed as weak metatarsal muscles but which she now believes was the first sign of lymphedema. Meyer himself testified that "I can remember years ago I was a little bitty kid and I always used to . . . say mommy, my feet burn . . . and my mom always used to see me sneaking buckets of water in my room and she never really understood why and I would always soak my feet my whole life because they just burned to bad . . .. [i]t never got out of control like it is now but . . . when I started thinking back at it I have been having these symptoms since I was a little kid." *Id.* at 73. Neither Meyer nor his mother mention him having a rash as a young child,[3] and Meyer's testimony clearly indicates that the problem has worsened over the years, so there is nothing inconsistent with a later statement by his physician that he had developed a rash "by

---

[3]The Court finds it unlikely that a weak metatarsal muscle would cause a rash, which further suggests that a rash was not one of Meyer's symptoms at the time.

early 2000."[4]

Next, the ALJ notes that in September 2003 a psychologist noted that Meyer described his health as "not too bad." *Id.* at 29. The ALJ fails to note that the psychologist immediately followed that statement with the following:

> He goes on to report some difficulties, however. These include cardiac disorder, high blood pressure, respiratory disorder, and attention deficit disorder. The respiratory disorder, asthma, affects him year-round and is currently treated via prescribed medications. He is also taking medications in treatment of the cardiac and blood pressure disorders. In fact, Mr. Meyer states that he is taking "a lot of medications" in treatment of these problems.

*Id.* at 829. In other words, the psychologist made it clear that Meyer's "not too bad" was qualified by the specific information he gave regarding his health. Therefore, the ALJ should not have considered the "not too bad" comment out of context. The ALJ also finds it noteworthy that the list of disorders mentioned by the psychologist does not include lymphedema. However, the psychologist clearly was not attempting to provide an exhaustive list of Meyer's health problems; indeed, it appears that his inquiry may have focused on the types of medications Meyer was taking, which logically would have led Meyer to discuss only those conditions for which he was taking medication. In any case, the absence of lymphedema on a non-exhaustive list of Meyer's health conditions recorded by a psychologist who was in no way treating Meyer for lymphedema is not an indication that Meyer was not suffering from lymphedema at the time, especially in light of the plethora of medical records that demonstrate that he was and the fact that the examination in question took place in September, outside of the January through May

---

[4]The Court further notes that "by early 2000"–the words the doctor used--is not the same as "in early 2000"–the words the ALJ uses; the doctor's words suggest that she may not have known exactly when the rash developed, but she did know for certain that it had developed "by early 2000."

period during which Meyer's symptoms are at their worst.

Next, the ALJ points to a consultative exam Meyer had with Elpidio Feliciano, M.D., in January 2004. As the ALJ notes, Meyer reported to Dr. Feliciano that he was experiencing severe leg pain. However, the ALJ apparently believes that those complaints are suspect because the doctor's report does not mention "any extraordinary pain behavior or limitations" and Meyer was able to walk normally, get on and off the exam table without difficulty, and walk on his heels and toes, tandem walk, and squat without difficulty. In summary, the ALJ found that "[t]he examiner apparently was able to perform strength testing in the lower extremities and straight leg raising test without eliciting any leg pain." *Id.* at 29. The actual report, however, includes the notation that "[r]eview of systems is positive for lower extremity pain"; *id.* at 502; in other words, the doctor's examination of Meyer revealed that he did, indeed, suffer from leg pain. While Dr. Feliciano does not use the word "extraordinary" to describe this pain, he also does not indicate in any way in his report that he believed Meyer was exaggerating his subjective complaint complaints, noting under the "impression" section of the report that Meyer's "main debilitating complaint is lower extremity pain secondary to his chronic lymphedema as described above." *Id.* at 503. When read as a whole, this report is entirely consistent with Meyer's subjective allegations.

In February 2004 Meyer presented to his treating dermatologist (and/or the nurse practitioner who works with him) complaining of severe leg pain that was "somewhat painful, but more of a burning sensation." The ALJ notes this fact and then continues:

> Again, however, in contrast to the claimant's subjective complaints, clinical exam of the bilateral legs revealed persistent reddening with some scaling and thickening of the skin, especially in the flexoral folds right at the ankle areas. Still, there were no open areas and no ulcerations noted. The legs did not seem to be extraordinarily tender to touch, there was no pitting edema, and strong pulses

were noted.

*Id.* at 29.  The Court is at a loss to understand how this medical report "contrasts" with Meyer's subjective complaints.  Clearly the exam confirmed that Meyer had the objective signs of lymphedema, which indisputably can cause pain.  There is nothing in the record to suggest that this pain only occurs in conjunction with "open areas" or "ulcerations," and nothing in the medical exam notes indicates that the doctor or nurse practitioner thought that Meyer's complaints were inconsistent with the objective observations.

In January 2005, treating cardiologist Irmina Gradus-Pizlo, M.D., examined Meyer and noted the presence of "significant erythema and swelling of both lower extremities below the knees with visible skin breakage" and that Meyer's "gait [was] severely affected by lower extremity discomfort."  *Id.* at 842.  Dr. Gradus-Pizlo concluded that Meyer's lymphedema was disabling.  *Id.* at 843.  Rather than accept this for what it is–clear support for Meyer's claim that his lymphedema (1) is worse January through May; (2) sometimes causes his skin to split open; and (3) is disabling–the ALJ concluded that he was "unable to accept that Dr. Gradus-Pizlo's report shows an accurate longitudinal clinical portrait, since none of the other previous repeat medical exams showed evidence of significant skin breakage or severely-impaired gait."  *Id.* at 30.  Again, however, Meyer does not allege that he suffers from skin ulcerations all of the time; rather his testimony indicates that his lymphedema sometimes causes that to occur and that the ointment his doctors prescribe help to heal his skin after that occurs.  *Id.* at 74.  Therefore, unlike the ALJ, the Court is not surprised that no ulcerations were noted by Dr. Randall in February 2005, a month after his appointment with Dr. Gradus-Pizlo.  It is also not surprising that his ability to walk improved once the ulcerations had healed.  To the extent that the ALJ suggests that Dr. Gradus-Pizlo's report is suspect because it differs from Dr. Randall's report a month

later, that suggestion is illogical.

In addition to pointing to what he perceives as contradictions between Meyer's allegations and his medical records, the ALJ also points to what he describes as "a relatively advanced level of activity that appears inconsistent with the claimant's combined alleged symptoms." Record at 33. For example, the ALJ takes issue with the fact that consulting psychologist Gover indicated that Meyer was "barely able to get out of the house and move someplace to do anything," but then noted that Meyer reported that he "regularly enjoyed cleaning his house" and sometimes "was able to fix sophisticated meals, such as fettuccini alfredo with chicken breasts," although he "had to rest perhaps three times to get the dishes done." *Id.* at 32. The ALJ neglects to acknowledge Dr. Gover's note that Meyer only prepared such meals "every once in awhile" and that he stated that "I don't have the energy to get up and cook a full meal most of the time." *Id.* at 527. There is a vast difference between occasionally feeling up to cooking a meal and being able to work, and there is nothing contradictory between Meyer's ability to cook once in awhile and his allegations of disabling symptoms. *Cf. Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004) ("But there is a deeper problem with the administrative law judge's discernment of contradiction. He failed to consider the difference between a person's being able to engage in sporadic physical activities and her being able to work eight hours a day five consecutive days of the week."). Further, the Court notes that the fact that Meyer might cook at meal *at home* in no way conflicts with the observation that it is difficult for him to *get out of the house* to do anything.

In addition, according to Dr. Gover's report, Meyer's statement about cleaning was as follows: "I like to clean my house. I don't like to live like a slob." Record at 527. That, without more–for example, an explanation of what "cleaning his house" means to Meyer and

how he carries out the cleaning activities–says nothing about his physical abilities and certainly nothing about his ability to work full time. *Cf. Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009) ("The Commissioner argues that Villano's testimony supported the ALJ's conclusion that she could perform a full range of sedentary work because she did housework, shopped, drove short distances, walked her dogs, and played with her grandchildren. But limited daily activities such as Villano's do not contradict a claim of disabling pain . . .and Villano also testified that she frequently took breaks and switched between sitting and standing, which further supports her claim."); *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001) (finding that activities such as "washing dishes, helping his children prepare for school, doing laundry, and preparing dinner" are "not of a sort that necessarily undermine[] or contradict[] a claim of disabling pain").

> The ALJ also makes the following observation about Dr. Gover's report:
>
> Dr. Gover reported that the claimant was talented in music and writing, and had potential for future accomplishment in both fields. His church connection gave help in these areas. He had done some public work in music. However, he needed a great deal of physical assistance to do these. Nevertheless, the claimant's report to the Administration reflects that he required little help to write music, as he simply sat on the couch with his pen and paper, composed song lyrics in his mind, and wrote them down.

*Id.* at 33. Again, the Court is simply at a loss to understand this statement. There is nothing inconsistent about saying that Meyer needs physical assistance to perform music in public but does not need physical assistance for the non-physical act of writing music in his own home. The ALJ's characterization of Meyer's statements as recorded by Dr. Gover as being inconsistent with Meyer's allegation of disabling symptoms is simply wrong.

The ALJ next points to the notes a state disability investigator took during a telephone conversation with a pastor at a church Meyer attended. The ALJ states:

> Of note, his pastor reported that the claimant did have some problems with his

> legs. Many times the claimant did not wear shoes, and most of the time he wore shorts, or baggy pants. However, the pastor did not report any of the debilitating symptoms that the claimant alleged. On the contrary, he was unaware of any problems with walking, believed that the claimant had "plenty of ability to work," and did not want to see him on disability.

Record at 33. The ALJ notes: "the claimant's pastor could not recall a time in which the claimant placed his feet in water during church . . .; [h]is report does not indicate any problems with sitting during church, and specifically notes the claimant had no problem with walking."[5] *Id.* at 35. The ALJ fails to note that the pastor stated that Meyer attended his church only sporadically, which means that the pastor's opportunity to observe Meyer was limited. Further, while the pastor did state that he could not recall a time that Meyer placed his feet in water during church, there is no indication that Meyer could not have done so without the pastor–who presumably was busy during the service- knowing about it. Perhaps Meyer sat in the back of the church and tried to mist his legs with water as unobtrusively as possible. As far as the pastor's statement that he "did not want to see" Meyer on disability, that is wholly unsurprising; presumably most people would agree that a young person is better off being gainfully employed than surviving on disability benefits. In addition, the pastor's opinion that Meyer "has plenty of ability to work" must be viewed through his limited opportunity to observe Meyer and the fact that his observations were made during short church services, not in a work environment. In addition, there is no way of knowing what the pastor meant by his statement, which cannot be equated with the opinion that Meyer can perform substantial gainful activity. Many disabled people have what could reasonably be termed by a layperson as "plenty of ability to work"–for

---

[5]This is another example of the ALJ mischaracterizing the record; the report actually notes that the pastor was "unaware of any problem with walking," not that the pastor believed Meyer had no problem with walking.

example, they might be capable of working in a sheltered environment, or working part-time, or working at a job that allows them to take breaks or miss work entirely for health reasons whenever necessary–but they are still "disabled" as defined by the Act.

Finally, and perhaps most egregiously, the ALJ twice points to the fact that Meyer testified that he "had accompanied friends who drove in their truck from Indiana to Tennessee (a six-hour drive each way)." *Id.* at 33, 35. However, the ALJ wholly fails to acknowledge Meyer's testimony regarding the manner in which he traveled:

> A: I went to Tennessee and that, oh man, that was not a good experience at all. . . .
> Q: How did you get there?
> A: My friend's mom was going up there for a wedding and so we went there and it was . . . in a big truck, a big Dodge Ram and I had to –
> Q: A big truck, where did you sit?
> A: I had to sit in the back. I had to have them clear–
> Q: In the –
> A: I had to–
> Q: flatbed?
> A: No, no, in the, it was a quad cab, the kind that has a . . . backseat and I had to require the whole back row.
> Q: How long did it take you to get there?
> A: I think it was like six hours or something like that and I had to–
> Q: How long did you stay there?
> A: I think it was, we stayed overnight and then half the day the next day, and then we came back and–
> Q: With the truck?
> A: Yeah, and I had to take–
> Q: What was the next trip that you took?
> A: That's the only one that I've taken –
> Q: Okay.
> A: –and when I did go there I had to take those spray bottles full of the ice water and ice packs. I mean, I had to do everything. I had to have, you know, my legs propped up. That's why I needed the whole backseat so I could prop my legs up and put the ice packs on them.
> Q: So, what did you do while you were there?
> A: Well, while I was there I stayed in the house. . . . I didn't even attend the wedding, you know, I just basically you know, stayed in the house in the air conditioning and I, you know, had, you know, this big, they had a big tub, it was a purple tub and I filled it up with cold water and it went all the way up to my knees and I just sat in it and I watched TV pretty much the whole time I was there.

*Id.* at 79-81. Meyer's testimony about the manner in which he took the trip to Tennessee–which, the Court notes, is only on the record due to Meyer's persistence in spite of the ALJ's interruptions and attempt to move on without listening to what Meyer had to say–makes the ALJ's blithe observation that Meyer took a trip to Tennessee with friends nothing less than a gross mischaracterization of the record. When viewed in its entirety, Meyer's testimony regarding the trip is entirely consistent with his allegations of disabling subjective symptoms and in no way supports the ALJ's credibility determination.

In addition, the Court notes again that Meyer's claim of disabling symptoms from his lymphedema is supported by the opinions of four of his treating physicians.[6] "A claimant . . . is not entitled to disability benefits simply because a physician finds that the claimant is 'disabled' or 'unable to work' . . . [because u]nder the Social Security regulations, the Commissioner is charged with determining the ultimate issue of disability." *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000) (citing 20 C.F.R. § 404.1527(e)). However, "[a] treating physician's opinion about the nature and severity of the claimant's impairment is normally given controlling weight so long as it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and is consistent with substantial evidence in the record. *Moss v. Astrue*, 555 F.3d 556, 560 (7th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2) and *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir.2008)).

After summarizing the four treating physicians' opinions in this case, the ALJ disregarded all of them, finding that they "appear inconsistent with and unsupported by the

---

[6]In addition to the four treating physicians, Dr. Gover, a consultative psychologist also opined that Meyer is disabled due to lymphedema. The ALJ properly discounted his opinion as being outside the scope of his expertise as a psychologist.

greater weight of the clinical and other substantial evidence." Record at 34.  First, with regard to the opinions of family practice physicians Dr. Virjee and Dr. Wagoner, the ALJ correctly notes that the record contains little more from them other than their conclusions that Meyer suffers from a variety of ailments, including lymphedema, and is disabled as a result.  If these opinions stood alone in the record, it would have been appropriate for the ALJ to reject them as unsupported.  The fact is, however, that the record also contains the opinions of Dr. Gradus-Pizlo, a treating cardiologist, and Dr. Randall, a treating dermatologist, both of whom describe their clinical observations of Meyer's condition at length and conclude that his lymphedema produces disabling symptoms.

      The ALJ rejected Dr. Gradus-Pizlo's opinion because, as previously noted, he viewed her description of Meyer's lymphedema symptoms as "almost an anomaly in its additional description of skin breakage and severely-impaired gait . . . and so required a conclusion that these findings did not provide an accurate longitudinal portrait of the claimant's general clinical status." Record at 35. With regard to Dr. Randall–the physician who diagnosed and has been treating Meyer's lymphedema, the ALJ commented as follows:

> Dr. Randall's [sic.] reports that the claimant could not stand for more than five to ten minutes at a time, that he could not sit with his legs bent for more than five minutes at a time (and indeed would need to sit with his legs elevated), and would need to place a cooling agent on his legs every ten to fifteen minutes, all appear demonstrably contradicted by the record.

*Id.*  The ALJ then discussed several aspects of the record that he believed contradicted Dr. Randall's considered medical opinion regarding Meyer's abilities, none of which are actually supported by the evidence of record.

      First, the ALJ remarks that Meyer "actually reported in at least a couple of instances that elevating his legs actually aggravated his symptoms." *Id.*  This is hardly a reason to discount Dr.

14

Randall's veracity or competency; perhaps sitting with his legs elevated is uncomfortable for Meyer but ultimately, if done on a consistent basis, would help alleviate some of the swelling in his legs, hence Dr. Randall's comment that he "should" sit with his legs elevated.  Next, the ALJ notes that "[a]t the hearing, [Meyer] reported that he attended church twice a week, once for an hour on Thursday, and once for two hours on Saturday.  Thus, he admitted to the Administration that he could tolerate his church services as long as the environment remained cool and he was allowed to sit through the entire service." *Id.*  It is not hard to imagine that at a church service Meyer can sit with his legs propped up, therefore eliminating the need for him to sit "with his legs bent for more than five minutes at a time."

The ALJ next raises again the comments by "the claimant's pastor"[7] and remarks once again on Meyer's trip to Tennessee, both of which the Court already has addressed. Inexplicably, the ALJ further notes that Meyer "acknowledged that he enjoyed sitting on his couch composing music"; again, there is nothing about that "acknowledgment" that contradicts Dr. Randall's report.  The ALJ also notes that he observed Meyer "[sit] at the hearing in no apparent distress for about an hour and ten minutes."  This is not entirely accurate, inasmuch as near the end of the hearing Meyer requested permission to stand up. *Id.* at 107.  Further, the ALJ does not note whether Meyer sat with his legs outstretched rather than bent; if he did, his ability to sit through most of the hearing would not be inconsistent with Dr. Randall's opinion at all. Finally, the ALJ notes that Meyer "admitted" that "he was able to independently maintain his

---

[7]The Court notes that it not an entirely accurate to call the pastor of a church which Meyer attended only sporadically "his pastor."  Neither is the ALJ's statement that the pastor "specifically notes that the claimant had no problem with walking" entirely accurate; as the Court has already noted, the report actually states that the pastor "was unaware of any problem with walking."  Record at 259.

15

home" and concludes that that "admission" further demonstrates a functional capacity substantially greater then Dr. Randall suggested.  What the ALJ neglects to mention is that Meyer's mother lives in an apartment six doors down from his; as Meyer testified, "As soon as I walk out my door she's like right here, man.  So, you know, we're so close because she helps take care of me anytime I need something."  *Id.* at 84.  Meyer's mother also testified about providing assistance to Meyer:

> I have to help him with some things there [in his apartment] there too, like . . . if he feels up to it I'll have him try to do the dishes and things like that, you know, if he could stand for five minutes or so.  Maybe try to make his bed but see he's got back problems too and scoliosis as well as the lymphedema and the heart problems and the high blood pressure.  So, most of the time I have to assist him, you know.  After a few minutes he has to sit down . . . .

*Id.* at 97.  This form of "independent" living is in no way inconsistent with Dr. Randall's opinion regarding Meyer's physical limitations.

As demonstrated by this lengthy discussion of the ALJ's decision, the ALJ improperly rejected both Meyer's testimony regarding his subjective symptoms and his treating physicians' opinions regarding the severity of his lymphedema by mischaracterizing the evidence of record and making indefensible leaps of logic.  In addition, the Court notes that the only contrary opinions of record pointed to by the ALJ in support of his determination that Meyer is not disabled are a letter from Dr. Hurwitz, one of Meyer's treating cardiologists, and the report of Dr. Budzenski, a consultative examiner.  However, Dr. Hurwitz's opinion is as lacking in detail as those of Dr. Virjee and Dr. Wagoner, both of which the ALJ rejected as conclusory.  As for Dr. Budzenski, although he mentions "edema" as one of Meyer's primary complaints and notes the presence of edema in his exam notes, he fails even to mention lymphedema as one of his diagnoses.  Record at 338.  In light of the fact that the ALJ found–consistent with all of Meyer's

16

physicians–that Meyer suffers from lymphedema and that it is a severe impairment, Dr. Budzenski's failure to even mention it makes his opinion suspect. The Court also notes that Dr. Budzenski found a residual functional capacity greater than that found by the ALJ, as did the state agency reviewing physicians whose reports the ALJ refers to in passing. The ALJ does not explain why these opinions–which he apparently does not fully agree with–are more reliable than those of Meyer's treating physicians. In other words, not only is the ALJ's rejection of the evidence that supports a finding of disability not adequately supported, neither is the evidence he points to in support of his finding that Meyer is capable of a certain range of sedentary work.

## CONCLUSION

For all of the reasons set forth above, the decision of the Commissioner in this case is not supported by substantial evidence and therefore must be **REVERSED**. This case is **REMANDED** for further proceedings consistent with this decision. The Court strongly urges the Commissioner to assign this case to another ALJ upon remand, and strongly urges that ALJ to not only review the entire record as it stands, but also to consider whether any additional evidence should be obtained–for example, the testimony of a medical expert or requests for additional explanations from those of Meyer's treating physicians who offered opinions of disability without explanation. *See, e.g.*, *Simila v. Astrue,* 573 F.3d 503, 516 (7th Cir. 2009) ("'An ALJ has a duty to solicit additional information to flesh out an opinion for which the medical support is not readily discernable.'") (quoting *Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004)); *Green v. Apfel*, 204 F.3d 780, 781 (7th Cir. 2000) ("[T]he procedure for adjudicating social security disability claims departs from the adversary model to the extent of requiring the administrative law judge to summon a medical expert if that is necessary to provide an informed basis for determining whether the claimant is disabled.").

SO ORDERED: 03/23/2010

*William T Lawrence*

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to:

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov

Charles Julian Myers
cmyers7943@sbcglobal.net